**Lannie L. HASZARD, et al., Plaintiffs,**

v.

**AMERICAN MEDICAL RESPONSE NORTHWEST, INC., dba AMR, an Oregon Corporation, and a division of Laidlaw, Inc., a Delaware corporation, Defendant.**

No. CV–00–0084–ST.

United States District Court,
D. Oregon.

Sept. 20, 2001.

Henry J. Kaplan, Bennett Hartman & Reynolds, Portland, OR, for plaintiffs.

Victor K. Kisch, Tonkon Torp, LLP, Portland, OR, Cheryl Hintz Middleton, Eileen Weresch-Doornink, Seattle, WA, for defendants.

## OPINION

STEWART, United States Magistrate Judge

### INTRODUCTION

Plaintiffs are more than 70 Emergency Medical Technicians ("EMTs") presently or formerly employed as hourly employees by defendant American Medical Response Northwest, Inc. ("AMR") either as EMT–Paramedics ("Paramedics") or as Emergency Medical Dispatchers ("EMDs"), also known as Controllers. They allege that AMR violates the overtime compensation requirements of the Fair Labor Standards Act ("FLSA"), 29 USC § 207, by failing to compensate them for all time spent in training. In particular, plaintiffs claim that their training is not "voluntary" or is "directly related" to their jobs and, therefore, must be paid as "working time" under 29 CFR § 785.27. Accordingly, plaintiffs seek declaratory and injunctive relief, an accounting, and judgment against AMR awarding them and all other similarly situated employees unpaid overtime compensation, plus an equal amount as liquidated damages.

This court previously granted partial summary judgment to plaintiffs on the issue of EMD training, and granted partial summary judgment to AMR against the Reach and Treat Team training and training of Washington Paramedics under Washington law and administrative rules through May 6, 2000. Opinion dated February 27, 2001(docket # 75). This court also determined that unresolved factual issues precluded summary judgment on the claims of the Oregon Paramedics.

Both parties now move for reconsideration and seek summary judgment on all the remaining issues in this case. For the reasons that follow, AMR's Motion for Reconsideration (docket # 80) is GRANTED as to the post-May 6, 2000 claims of the Washington Paramedics and DENIED as to the Oregon Paramedics, and plaintiffs' Motion for Reconsideration (docket # 86) is GRANTED as to the Oregon Paramedics.

### ANALYSIS

#### I. Factual Background

The factual background of this case is set forth in detail in this court's February 27, 2001 Opinion, pp. 4–7, and is incorporated herein by this reference.

#### II. Claims of Washington Paramedics After May 6, 2000

One remaining issue concerns the claims by Washington Paramedics for the time period after May 6, 2000, when several provisions of the Washington Administrative Code were repealed and amended. Washington law requires Paramedics to be certified and have standing orders through the Medical Program Director ("MPD") of the county in which they work. RCW 18.71.011 & 18.71.205(4) & (6). Since May 6, 2000, Washington Paramedics have been required to complete 150 hours of continu-

ing medical education ("CME") every three years. WAC 246–976–161 (Table A). Of those 150 hours, six hours must be devoted to pediatrics and the remaining hours must be on topics approved by the MPD. *Id.*

Both parties acknowledge that the amendments to the administrative rules did not substantively change the CME requirements imposed on Washington Paramedics. Thus, for the same reasons previously set forth in this court's February 27, 2001 Opinion, AMR is entitled to summary judgment against the remaining (post May 6, 2000) claims of the Washington Paramedics.

## III. *Oregon Paramedics*

This court previously denied summary judgment as to the claims by the Oregon Paramedics due to disputed issues of material fact. The parties have now submitted additional deposition testimony, affidavits, and other materials, to support their respective requests for summary judgment on those claims. For the reasons that follow, this court finds that the training time in excess of 24 hours over a two year period for AMR's Oregon Paramedics is compensable "working time."

As this court previously explained:

In order for the Paramedic training time to be excluded from "working time," plaintiffs must prove that one of the four criteria of 29 CFR § 785.27 is not met, or AMR must prove that the training time constitutes a "special situation" under 29 CFR § 785.31. The parties agree that two of the four criteria of 29 CFR § 785.27 are met but dispute whether the training time is "voluntary" or "directly related" to the Paramedics' jobs. If the training time is not "voluntary" or is "directly related" to the Paramedics' jobs, then it must be counted

as "working time," unless it satisfies the "special situation" of 29 CFR § 785.31. February 27, 2001 Opinion, pp. 22–23.

With respect to the two of the four criteria in dispute, plaintiffs contend that the training time is not "voluntary" or is "directly related" to their jobs, and hence is compensable as "working time." AMR responds that the training time is "voluntary," and even though "directly related," is nonetheless exempt as a "special situation."

### A. *Whether the Paramedic Training Time is "Voluntary"*

#### 1. *Legal Standard*

■ Training is not "voluntary" if it is "required" by the employer. 29 C.F.R. § 785.28. A plaintiff seeking to show that he is "required" by his employer to attend training need not show that the employer has a rule terminating those who do not attend training. Instead, training is "required" if the employee is "led to believe" that his or her working conditions or continuance of his or her employment "would be adversely affected by nonattendance." *Id.* Conversely, training is "voluntary" if it is imposed not by the employer, but by a governmental agency which requires the training for any employment in that line of work:

[W]here a State or Federal agency requires individuals to take training as a condition of employment with any employer engaged in the [subject] business . . . attendance at such training would be voluntary [under 29 CFR § 785.27(b) ], *provided the employer does not impose additional requirements on the employee such as taking a particular course(s).*

Wage and Hour Letter Opinion, WHM 99:8195, 8195–96 (November 19, 1998) (emphasis changed); *see also* Wage and Hour Opinion Letter, WHM 99:8292, 99:8292–3

(September 30, 1999) (in a case involving licensed vocational nurses, stating "where a State requires individuals to take training as a condition of employment with any employer ... attendance at such training would be voluntary and this criterion met provided the employer does not impose additional requirements on the employee, such as taking a particular course(s)"); Wage and Hour Opinion Letter, WHM 99:8183, 99:8183 (September 10, 1998) (same in a case involving child care workers); Wage and Hour Opinion Letter, WHM 99:8099 (September 15, 1997) (same in a case involving insurance agents).

### 2. *Oregon law*

Oregon requires all EMTs to be state-certified and prohibits them from providing patient care or treatment without written authorization and standing orders from a Physician Supervisor who has been approved by the Board of Medical Examiners of the State of Oregon. ORS 682.135(1)(a); ORS 682.245(4); OAR 333–265–0070(1); OAR 847–035–0030(5). Any physician who desires to do so may apply for approval to act as a Physician Supervisor. OAR 847–035–0001(12).

The Board of Medical Examiners has delegated to the Health Division of the Department of Human Services ("Health Division"), the responsibility to approve Physician Supervisors. OAR 847–035–0030(12). In addition, Oregon law delegates to the Health Division the authority to issue certificates to EMTs, and the responsibility to "adopt a schedule of minimum educational requirements" for EMTs. ORS 682.145(1) and (3). Pursuant to that authority, the Health Division has enacted administrative rules requiring CME requirements for recertification.

To be recertified, Oregon Paramedics must obtain a total of 24 hours of CME every two years, which may be obtained in EMS clinical topics, EMS related topics, or professional development topics. OAR 333–265–0130(1). Oregon Paramedics also must obtain a "verification of competencies by a Board-approved medical director" in seven specified skills areas based on either: (1) "personal observation in the field by the medical director," (2) "demonstration in a classroom or laboratory setting," or (3) "documented successful field performance demonstrated by agency quality assurance program data." OAR 333–265–0130(2)(a)–(h); Fuller Depo, p. 12.[1] The Physician Supervisors have the discretion to determine the method by which they determine and verify competencies. OAR 333–265–0130(2)(h); Jui Depo, pp. 28–29, 53. Additionally, the Physician Supervisor (or his designee) must provide or coordinate formal case reviews for EMTs and meet with each EMT for a minimum of two hours each calendar year. OAR 847–035–0025(1)(e) & (3); Schmidt Depo, p. 25.

### 3. *Analysis*

■ Since Oregon requires certain training in order to work as a Paramedic, attendance at such training by AMR's Oregon Paramedics is "voluntary" provided that AMR does not impose any additional requirements. Plaintiffs assert that AMR imposes additional requirements above and beyond Oregon's requirements either directly or indirectly through: (1) excessive involvement in monitoring and enforcement of the training requirements with the MPDs and Physician Supervisors; and (2) "institutionalization" of the requirements in its county contracts, job descriptions, and job announcements.

---

**1.** Deposition, declaration, and affidavit references are to the last name of the deponent/affiant.

This court previously denied summary judgment due to competing inferences reasonably arising from the record at that time. Based on the supplementation of the record, this court concludes that the additional training requirements are not imposed by AMR, but are imposed by the Physician Supervisors without regard to accommodating AMR. Hence, the training is "voluntary."

### a. *Additional Requirements*

As previously noted, Oregon law requires 24 hours of CME every two years and "verification of competencies by a Board-approved medical director" in seven specified skills areas. OAR 333-265-0130(2)(a)-(h). Additionally, the Physician Supervisor (or his designee) must provide or coordinate formal case reviews and meet with each EMT for at least two hours each calendar year. OAR 847-035-0025(1)(e) & (3).

How the Physician Supervisors verify competencies is the crux of the parties' dispute. Oregon law allows the Physician Supervisors to verify competencies in three ways: (1) personal observation, (2) classroom or laboratory demonstration; or (3) quality assurance data. Rather than relying either on field observation or quality assurance data, the Physician Supervisors for Multnomah and Clackamas Counties have chosen to verify competencies primarily by the second method, namely by requiring EMTs to maintain current certifications in Advanced Cardiac Life Support ("ACLS"), Pre-Hospital Trauma Life Support ("PHTLS"), and Pediatric Advanced Life Support ("PALS").[2] Obtaining these recertifications requires substantial hours of classroom training. ACLS and PALS recertification each require eight hours of training every two

years and PHTLS recertification requires eight hours of training every three years. Fuller Dec, ¶ 2. However, those hours can be counted toward fulfilling the minimum requirement of 24 hours of CME every two years. Second Jui Depo, p. 34.

Plaintiffs complain that their competencies can and should be verified by a less time-consuming method than the extensive and redundant classroom training associated with the ACLS, PHTLS, and PALS recertifications. They prefer that the Physician Supervisors verify their competencies by one of the other methods allowed, such as skills testing. Although skills testing does not count towards the 24 CME hours, it can be completed in a couple of hours. Second Schmidt Depo, pp. 29-30.

The other disputed area is case reviews. The Physician Supervisors require AMR's Oregon Paramedics to obtain 12 hours of case reviews each year in addition to the 24 CME hours every two years. Oregon law requires no specific number of hours of case reviews. However, as with the certifications, hours spent in case reviews can be counted toward fulfilling the 24 hour CME requirement. Moreover, AMR's Paramedics often satisfy three of the 12 hours by attending the in-service each year offered and paid for by AMR. *Id* at 35.

Although the record is not crystal clear on this point, the parties orally advised the court that AMR's Paramedics in Multnomah and Clackamas Counties obtain an average of 50-60 hours of paid and unpaid training each year. Those hours include specific paid training required by AMR, 24 CME hours every two years required by the state, 12 case review hours annually required by the Physician Supervisors, and the hours necessary to obtain the ACLS,

---

2. According to Dr. Jui, the certification courses encompass over 80% of all skills validations required. Second Jui Depo, p. 31.

Dr. Schmidt estimates that 90% plus of the verification of skills is through the certification courses. Second Schmidt Depo, p. 23.

PHTLS, and PALS certifications required by the Physician Supervisors. Some case review and certification hours count towards and are included in the CME hours.

### b. *Imposed by AMR*

This court previously rejected plaintiffs' assertion that AMR imposes these additional requirements either directly or indirectly through excessive involvement in monitoring and enforcement of the training requirements with the MPDs and Physician Supervisors:

> Simply put, AMR's role in tracking plaintiffs' training and sending reminders to plaintiffs is legally irrelevant. If an employee fails to obtain recertification to work as a Paramedic, then AMR can no longer use that employee's services as a Paramedic. AMR has an interest in ensuring that its Paramedics maintain their recertification and can be expected to coordinate with the MPDs and Physician Supervisors to accomplish that result. As long as a state imposes certain training obligations on Paramedics requesting recertification, then training taken by AMR's Paramedics to obtain their recertification is not rendered involuntary simply because AMR monitors, and together with the MPDs, enforces compliance. Thus, the only relevant question is who in fact imposes the training requirements, not who monitors compliance with those requirements.

February 27, 2001 Opinion, pp.24–25.

Plaintiffs have submitted no new evidence which persuades this court otherwise. A closer issue is whether the Physician Supervisors independently require ACLS, PHTLS, and PALS certifications and 12 case review hours annually or impose those requirements in concert with AMR.

A close link exists between the Physician Supervisors and the franchise authority of Multnomah and Clackamas counties over EMS services. Multnomah County employs one Physician Supervisor and in 1995 hired Dr. Jui to fill that position. Second Jui Depo, pp. 4–6. Dr. Jui supervises over 1,300 EMTs in Multnomah County, including 300 Paramedics, and over 1,000 EMT–Basics, including AMR and its employees, and several fire districts within Multnomah County. Jui Depo, pp. 6–7; First Jui Depo, p. 54; Lauer Depo, p. 8. Multnomah County uses AMR's franchise fees to pay Dr. Jui and his assistants (if any). *Id;* Multnomah County Ordinance § 21.417(G) ("The administrator is authorized to collect fees from employers of EMTs to off-set the cost to the county for the EMSMD and any assistants. These fees shall be limited to the salary and benefits of the EMSMD and agents. Fees will change only with compensation changes.")

Unlike Multnomah County, Clackamas County does not employ one Physician Supervisor for all of its EMTs. Instead, each entity which employs EMTs in Clackamas County typically contracts for physician supervision. Schmidt Depo, pp. 7–8. Through a contract between AMR and Oregon Health Sciences University ("OHSU"), Dr. Schmidt, a faculty member at OHSU, is the Physician Supervisor for AMR's Paramedics practicing in Clackamas County. *Id* at 5–7. Dr. Schmidt assisted in writing Clackamas County's Request for Proposal and its contract with AMR. Second Schmidt Depo, pp. 57–58. AMR is the only agency that pays for Dr. Schmidt's supervision of its Paramedics. Schmidt Depo, p. 7. The contract between AMR and OHSU contains the following requirement:

> OHSU physicians will act as course medical director or arrange for a medical director for a minimum of two (2) Advanced Cardiac Life Support [ACLS] courses, two (2) Prehospital Trauma Life Support [PHTLS] courses, and two

(2) Pediatric Advanced Life Support [PALS] courses.

These course requirements may be re-negotiated by either party based upon changes in EMT CME requirements. Plaintiffs' Exhibit 53, p. 2.

In sum, Dr. Jui is employed by AMR's customer (Multnomah County) and paid in part by AMR's franchise fees, and Dr. Schmidt is employed by OHSU, with whom AMR has a contract, and paid entirely by AMR. As a result, both have an economic incentive to maintain a good working relationship with AMR by accommodating AMR's needs. AMR has no direct contractual control over either Dr. Jui or Dr. Schmidt, but must request either Multnomah County or OHSU to change Physician Supervisors. Nevertheless, as Dr. Schmidt acknowledges, OHSU likely would accommodate that request. Second Schmidt Depo, pp. 10–11.

Based on the close relationship of Drs. Jui and Schmidt with AMR, a reasonable basis exists to suspect their motives. To the degree that they require verification of competencies through classroom training, they save significant hours of field observation, data collection, and data evaluation time, and consequently save their employers, and hence AMR, valuable hours of their and their agents' time. At the same time, this method of verifying competencies imposes significant numbers of hours of training time on the Paramedics. Based on that suspicion, plaintiffs argue that it is more than mere coincidence that both Physician Supervisors require the same training that AMR promised the Counties that it would provide to its employees. They contend that these two Physician Supervisors act primarily as agents of AMR.

AMR's winning proposals to Multnomah and Clackamas Counties, which were later incorporated by reference into the resulting franchise agreements, expressly state that AMR's Paramedics will be trained and certified in ACLS, PHTLS, and either PALS (Multnomah County) or basic cardiac life support ("BCLS") (Clackamas County). Plaintiffs' Exhibit 12, p. 3; Plaintiffs' Exhibit 18, p. 18. Thus, AMR's proposals to both Multnomah and Clackamas Counties specifically incorporated the requirement that their employees maintain certifications which were at that time either expressly required under state law (BCLS and ACLS) or covered topic areas (trauma and pediatric training) which were required as part of the administratively-mandated CME hours (PHTLS and PALS).

When Oregon's Administrative Rules changed in late 1995, AMR's contracts were not modified, but continue to require the maintenance of specific certifications no longer expressly required by Oregon law. Moreover, AMR requires its Paramedics to be certified in ACLS, PHTLS, and PALS, regardless of the requirements imposed by the Physician Supervisors. Plaintiffs' Exhibit 29 (Field Operations Policy and Procedure Manual), §§ 7.1.1 & 7.1.3.

Therefore, if the Physician Supervisors did not require the certifications, AMR would do so in order to comply with its contractual obligations. If AMR, not the Physician Supervisors, required the certifications, then the training time would not be "voluntary" and would be compensable. Accordingly, plaintiffs are justifiably suspicious that the Physician Supervisors impose the training requirements to benefit AMR by exempting AMR from paying for the training time. The critical issue is whether the Physician Supervisors exercise their discretion to verify competencies through certifications and case reviews for reasons of their own or to accommodate AMR's franchise obligations and economic interest.

Both Physician Supervisors have articulated reasons for their training requirements other than a desire to abet AMR. Dr. Jui initially testified that his requirements come from a "consensus of practice of ... physician supervisors in other states," are "promulgated throughout the state, and [are] fairly common community standards" which are a "combination of the state requirements as well as the community standards for practicing medicine." Jui Depo, pp. 15–16, 45. However, plaintiffs' new evidence belies the existence of any state-wide consensus.

Dr. Jui has clarified that he imposes the ACLS, PALS, and PHTLS certification requirement because it is the same as OHSU's credentialing requirements to practice emergency medicine at OHSU. Second Jui Depo, p. 10. He also chose this requirement, at least in part, as a time-saving measure because "it does take a lot of time and effort to do personal observation in the field." Jui Depo, p. 54. Similarly, Dr. Schmidt prefers certifications over personal observation both as a time-saving measure and for practical reasons. Second Schmidt Depo, p. 23; Schmidt Depo, pp. 20–21, 49–51 ("you can't schedule a heart attack"). She cannot use the other method of verifying competencies through quality assurance data because "the paramedics don't see enough of these things [cardiac arrest patients, trauma patients, and intubations] to use it as a mechanism of guaranteeing competence.". Second Schmidt Depo, pp. 20–21. She also is reluctant to rely on mere data. Id at 21.

With respect to the annual requirement of 12 hours of case reviews, both Physician Supervisors acknowledge that the number of hours is arbitrary.[3] They require case reviews in order to verify competencies

and to satisfy their obligation to meet personally with the Paramedics they supervise. Jui Depo, p. 30; Schmidt Depo, pp. 9–10, 25.

Dr. Jui also imposes his requirements for medical reasons. Second Jui Depo, p. 49. In his view, Paramedics need to be prepared to make decisions "off line" (independently) as to the therapy (drugs or other intervention) needed in the field. Second Jui Depo, pp. 42–44. As a result, he opines that Paramedics "should be trained to a very high degree" and considers his requirements as "directly correlated hand in hand" with his standing orders. Id at 43, 45.

Dr. Schmidt similarly explained that while case reviews are not directly required for state certification, she requires them for Paramedics to work under her standing orders. Second Schmidt Depo, pp. 59–60. They enable her to convey changes in medical protocols that Paramedics need to implement, such as how to administer new drugs and prevent dangerous drug interactions. Id at 55–56.

Accordingly, Drs. Jui and Schmidt disclaim any direct or indirect connection with AMR's training requirements, but exercise their discretion independently of AMR. Nonetheless, they have not uniformly imposed their ACLS, PHTLS, and PALS certification requirements. Plaintiffs suggest that this disparate enforcement reflects that Drs. Jui and Schmidt are not acting solely pursuant to state regulations, but for other reasons.

In 1997, and again in 1999, the Physician Supervisors allowed AMR's Paramedics to verify competencies by skills testing due to the lack of ACLS and PALS courses. Fuller Depo, pp. 55–56. At least from

---

**3.** Dr. Jui arbitrarily chose that number of hours in 1995 because it was the same number as CME hours required (24 hours every two years), and in part because he thought it was "a nice number." Second Jui Depo, pp. 11, 32, 34. Dr. Schmidt just "made it up." Second Schmidt Depo, p. 36.

1995 to 1998, Dr. Jui also allowed the Portland Fire Bureau Paramedics to comply with fewer hours of PALS training due to the unavailability of PALS courses and to do skills testing instead. Second Jui Depo, pp. 12–14, 18. Dr. Jui acknowledged that the Portland Fire Bureau Paramedics are still not current in their PALS certifications and, to some extent, their ACLS certifications, due to the lack of availability of training monies. *Id* at 15. Dr. Jui also acknowledged that the Gresham Fire Department had just recently finished its ACLS course and was working on getting a PALS course. The primary reasons for this are budgetary constraints and lack of PALS courses. *Id* at 25, 27.

Dr. Jui explains this inconsistency by the tentative nature of his regulatory authority over the Portland Fire Bureau and Gresham Fire Department. As first responder agencies (unlike AMR), they are not required to have him supervise the Paramedics.[4] *Id* at 20–22. According to an intergovernmental agreement, if the Portland Fire Bureau or Gresham Fire Department is dissatisfied with his supervision, it could dissolve the intergovernmental agreement "overnight" and hire a different Physician Supervisor to meet the state's requirements. *Id* at 21–22, 48. Consequently, he lobbied with the Portland Fire Bureau to provide additional funding for training and as of 2001 would no longer allow one of its Paramedics to avoid obtaining current certifications. *Id* at 17.

Dr. Schmidt also acknowledges that when the PALS certification courses were not available, the Paramedics she supervised "got by with fewer hours of training." Second Schmidt Depo, p. 16. When asked how she would handle a request by AMR to reduce this training due to budgetary constraints, she could not respond and said that she would simply have to think about it and discuss it with AMR. *Id* at 26–27. When Dr. Schmidt was the Physician Supervisor for the Clackamas Fire District # 1 from 1990–98, she testified that she imposed the same training requirements as she later imposed on AMR. *Id* at 41–42. However, according to the Executive Officer of that fire district, Dr. Schmidt did not require its paramedics to recertify in either PHTLS or PALS. Plaintiff's Exhibit 59, ¶¶ 3, 5. Until approximately 1995 or 1997, Dr. Schmidt had no requirement that Paramedics remain current in their courses, and it was sufficient if they had taken the certification courses years earlier, even if the certification had lapsed. Second Schmidt Depo, pp. 39–41. However, Dr. Schmidt explained that she changed her requirements in 1997 as part of "an evolutionary process." *Id* at 57.

Although Drs. Jui and Schmidt have not intransigently insisted on classroom training for verification of competencies, they clearly have attempted to do so. Their attempts have been thwarted by circumstances beyond their control or the control of the public agencies. Indeed, their actions in this regard are akin to granting extensions of time to comply. The extension that Dr. Jui granted to the Portland Fire Bureau is similar to extensions previously provided to AMR's Paramedics who for various reasons missed the deadline for completing required training. Second Jui

---

4. Multnomah County Ordinance § 21.417(B) provides that:

The [Emergency Medical Service Medical Director] *shall* serve as the physician supervisor for all EMTs in the employ of licensed ambulance services within the county and working within the county. In addition, the EMSMD *may* serve as the physician supervisor for EMTs employed by EMS first responder agencies, by agreement with the county.

Second Declaration of Eileen Weresch–Doornink, Exhibit K, p. 1 (emphasis added).

Depo. pp. 12–13; Jui Depo, pp. 31–32. The granting of extensions or temporary waivers does not prove that the requirements derive from AMR.

Furthermore, Drs. Jui and Schmidt credibly testified about the unavailability of PALS courses and an inability to enforce the requirement until more courses were available. Now that PALS courses are widely available, they do enforce that requirement.

In sum, the evidence is insufficient to sustain plaintiffs' burden to prove that the Physician Supervisors defer their professional judgments and training preferences to AMR's contractual obligations to Multnomah and Clackamas Counties. Instead, the evidence persuades this court that to the extent Drs. Jui and Schmidt impose more hours of training than are required under Oregon law, they do so not for the convenience of AMR or to accommodate AMR's franchise obligations. Instead, they seek to maintain a high level of skill for Paramedics operating under their standing orders.

### B. *Whether the Paramedic Training Time is "Directly Related"*

As discussed above, if any of the four criteria of 29 § 785.27 is not met, then AMR must pay for the training time. Therefore, even if the training time for Oregon Paramedics is "voluntary," it is compensable under 29 CFR § 785.27(c) provided that it is "directly related" to plaintiffs' jobs.

AMR concedes that the training time, including both the ACLS, PHTLS, and PALS certification training and case reviews, is "directly related" to the jobs of its Paramedics in the sense that such training improves their ability to perform their jobs. As a result, the training time for AMR's Paramedics in Oregon is compensable unless it is exempt as a "special situation" under 29 CFR § 785.31.

### C. *Whether the Paramedic Training Time is a "Special Situation"*

■ To claim the benefit of the "special situation" exemption, 29 CFR § 785.31, AMR bears the burden of proof. According to this exemption, "[t]here are some special situations where the time spent in attending lectures, training sessions and courses of instruction is not regarded as hours worked." 29 CFR § 785.31. The exemption does not contain a definition of a "special situation." However, the next two sentences give one such example:

> For example, an employer may establish *for the benefit of his employees* a program of instruction which corresponds to courses offered by independent bona fide institutions of learning. *Voluntary* attendance by an employee at such courses outside of working hours would not be hours worked even if they are *directly related* to his job, or paid for by the employer.

29 CFR § 785.31 (emphasis added).

To clarify what types of "special situations" are not regarded as "hours worked," various administrative opinions focus on the language in the example that the program of instruction be established "for the benefit of" the employees. Hence, continuing education or "refresher" courses offered by an employer are regarded as training offered primarily for the benefit of the employee, and thus exempt, if they (1) "correspond to courses offered at independent bona fide institutions of learning" and (2) enable an individual to gain or continue employment with any employer. Wage and Hour Letter Opinion, WHM 99:8195, 99:8195 (November 19, 1998) (training required by Nuclear Regulatory Commission deemed "voluntary" if the training is a condition of employment with any employer engaged in the business of handling radioactive materials); Wage and Hour Letter Opinion, WHM 99:8174, 99:8175,

1998 WL 1147715 (July 15, 1998) (ongoing required refresher training for Paramedics to continue to practice regarded as "primarily for the benefit of the employee and not the employer."); Wage and Hour Opinion Letter, WHM 99:1302, 99:1303, 1980 WL 141338 (October 23, 1980) (Paramedic not entitled to compensation for attending, among other things, refresher training, a CPR course, and an ACLS course because they were primarily for the benefit of the employee).

### 1. *Courses Offered by Independent Bona Fide Institutions of Learning*

As this court previously concluded, the ACLS, PHTLS, and PALS certification courses offered by AMR to its Paramedics clearly correspond to courses offered at independent bona fide institutions of learning. These certification courses are offered at community colleges. Fuller Dec, ¶ 6; *see also*, www.healthprofessionals.pcc.edu (Portland Community College offering ACLS and PALS courses) and www.americanheart. org/ Heart_and_Stroke _A_Z_Guide/hpro.html (noting that "The Association's Advanced Cardiac Life Support and Pediatric Advanced Life Support classes trained more than 515,000 healthcare professionals in the latest advanced life support techniques between 1998 and 1999."). Furthermore, both Washington and Oregon authorize AMR to provide EMS training courses and AMR is a community training center recognized by the American Heart Association. Fuller Dec, ¶ 9.

However, case reviews do not easily fit into the "special situation" exemption. OAR 333.265–0000(12) gives the following definition of case reviews:

"Formal Case Review" means an educational presentation in which a physician or physician-designee [5] utilizes an actual ambulance or rescue call as a basis for educating EMTs. A formal case review includes a review of the call, review of the documentation prepared by the ambulance or rescue crew, discussion of the patient's course of care in the emergency department or hospital inpatient areas, and instruction on the clinical issues raised by the particular patient.

Case reviews provide a way to review actual cases to insure that high standards of medical care are maintained, similar to morbidity and mortality conferences offered at OHSU and other teaching hospitals. Second Fuller Dec, ¶¶ 5–6. They involve Paramedic(s) and doctor(s) meeting and discussing various aspects of actual cases which were handled by the Paramedic(s). Second Fuller Dec, ¶ 2; Jui Depo, p. 11; Wittwer Depo, pp. 13–14; Schmidt Depo, pp. 9–10; Schneider Depo, pp. 20–21. Case reviews are coordinated by the Physician Supervisors and are often held at AMR training facilities. Second Fuller Dec, ¶ 6. Case reviews also are sponsored by OHSU, and hosted by numerous other training facilities, including the Clackamas County Fire training facility, the Portland Fire training facility, the Southwest Washington Medical Center, and Clark County Fire District training facility. *Id*, ¶¶ 5–6. Case reviews are open to, and attended by, both AMR Paramedics and non-AMR Paramedics. *Id*, ¶ 3. Case reviews similar in nature and content to those offered by AMR are routinely offered at the annual Oregon State EMS Conference, and other EMS conferences. *Id*, ¶ 6.

---

**5.** A "physician-designee" does not need to be a physician, but can include even an EMT-Basic that a medical director has authorized to conduct formal case reviews. OAR 333–265–0000(19).

This description of case reviews is not similar to a course at a bona fide institution of learning. As Dr. Schmidt confirmed:

Q: You also require a certain number of case reviews per year?

A: That's correct.

Q: And what is that number?

A: Twelve.

Q: And are the case reviews similar to a course that you would take in school?

A: *No, they're not at all.* The case reviews are an opportunity to have an interaction with physicians about specific cases and actual clinical scenarios.

Schmidt Depo, p. 5 (Emphasis added).

That Physician Supervisors are asked to host case reviews for agencies other than their own does not imply that case reviews correspond to courses offered by independent bona fide institutions of learning. By analogy, a firm or a governmental agency that conducts in-house reviews of cases for the benefit of its staff members may present information that is similar in some respects to clinical training offered in a law school, but such reviews do not "correspond" to law school courses.

Thus, case reviews do not fall under the "special situations" exemption.

#### 2. *For the Benefit of the Employees*

Given that the ACLS, PHTLS, and PALS certifications are the types of course encompassed by the "special situations" exemption, the next issue is whether they enable plaintiffs to gain or continue employment not just with AMR, but with any employer.

AMR contends that because ACLS, PHTLS, and PALS certifications render plaintiffs employable elsewhere, the "special situations" exception automatically applies. This logic would render the "special situations" not special at all, but quite routine. After all, *any* training that is directly related to work will generally help a person obtain similar work elsewhere.

The Department of Labor intended these "special situations" to apply only to a narrow range of circumstances, such as when an employer establishes for the benefit of its employees a program of instruction which corresponds to courses offered by independent bona fide institutions of learning. The question of whether these courses are for the benefit of the employees turns on whether they are *necessary* (not merely sufficient) for employment with other agencies. The undisputed evidence establishes that the certifications and case reviews required by the Physician Supervisors in Multnomah and Clackamas Counties are not needed for employment as a Paramedic elsewhere in Oregon.

The need for training to gain employment with other employers of Paramedics does not turn on the subjective motivations of the local Physician Supervisors. To the extent that the Physician Supervisors impose training time obligations on the Paramedics over and above the *minimum* number of hours required for state certification, then those hours are not primarily for the benefit of the employee. Here, plaintiffs have produced overwhelming uncontroverted evidence that, at least among the larger employers of Paramedics in Oregon, plaintiffs would have no trouble satisfying the recertification requirements within the 24 hours of CME training required by the state.

Plaintiffs' survey of 11 other Oregon jurisdictions reveals only one other jurisdiction which has requirements equivalent to Multnomah and Clackamas Counties. The City of Salem Fire Department's EMS Division includes 89 paramedics. They must maintain current certifications in ACLS, PHTLS, and pediatric pre-hospi-

tal care. Additionally, they must attend four out of six EMS inservices annually which are between three to four hours long and include case reviews. Plaintiffs' Exhibit 63.

However, this is the exception, rather than the rule. Several providers of EMS do not require any current certifications.[6] Others require only the ACLS certification.[7] Thus, maintenance of current certi-

fications in ACLS, PHTLS and PALS is generally not required to be recertified as a Paramedic outside AMR.

By comparison, the certification and case review requirements imposed upon AMR's Paramedics in Multnomah and Clackamas Counties exceed the norm in Oregon. Of course, by obtaining the ACLS, PHTLS, and PALS certifications and 12 hours of case reviews a year, an

---

6. Tualatin Valley Fire and Rescue ("TVF & R") provides paramedic services to a population of over 400,000 residents, including 10 cities and unincorporated portions of Multnomah, Clackamas and Washington Counties. Its Paramedics participate in a monthly skills program while on duty, and three four-hour in-service programs per year. They are not required to maintain their ACLS, PHTLS or PALS certifications. Plaintiffs' Exhibit 54.

The Eugene Fire Department is the third largest in Oregon and includes 105 Paramedics responsible for transports. It provides a program of on-duty EMS continuing education and requires two classes and case reviews, but no certifications. Plaintiffs' Exhibit 64.

The Hillsboro Fire Department Paramedics are not required to maintain current certifications in ACLS, PHTLS, PALS, or any other certifications other than a CPR card, which is accomplished within the 24 CME hours mandated by the state. Instead, the Paramedics demonstrate their skill to the Physician Supervisors while on duty. The Physician Supervisors also perform case reviews and in-service training during on-duty time, typically once per quarter for two to three hours. Plaintiffs' Exhibit 61.

The Lake Oswego Department of Fire and Life Safety Services employs 24 Paramedics. They are not required to maintain certifications in ACLS, PHTLS, or PALS, but must attend an annual "Bi-County Protocol" update. The Physician Supervisors perform case reviews by seeing each of the Paramedics while on duty for approximately two to three hours every two months. Plaintiffs' Exhibit 66.

The 10 Paramedics in the Medford Fire Department participate in a program of on-duty EMS continuing education. They are not required to maintain ACLS, PHTLS, or PALS certifications, but must attend six case

reviews (of approximately two hours each) every two years. Plaintiffs' Exhibit 62.

7. The Clackamas Fire District One which employs approximately 85 Paramedics and 25 EMTs in its field operations. It provides advanced life services to more than 135,000 residents of Clackamas County and from 1995 to 1997 also handled patient transports. It requires all of its Paramedics to maintain current certification in ACLS, but not PALS or PHTLS. The District does skills assessment through its training division to satisfy the state requirements. Plaintiffs' Exhibit 59.

The Springfield Fire Department employs 55–60 Paramedics who provide transport services. They must maintain current ACLS certification, but no other certifications. They attend an academy for one week each year, which includes the ACLS training. Plaintiffs' Exhibit 68.

The City of Bend Fire Department has an EMS Division of 38 paramedics who are responsible for transports. They must maintain the ACLS certification, but not the PHTLS and PALS certifications. Case reviews are offered for approximately two hours every three months for on-duty employees. Plaintiffs' Exhibit 60.

The Douglas County Fire District No. 2 includes 25 Paramedics who perform transports. They must maintain current ACLS certification, but no other certifications, and have case reviews for two to three hours each month while on duty. Plaintiffs' Exhibit 67.

The Corvallis Fire Department requires its Paramedics to maintain ACLS certification, but not PHTLS and PALS certifications. It does EMS training once a week, which typically includes case reviews. Plaintiffs' Exhibit 65.

AMR Paramedic would be highly employable elsewhere. However, the converse is not true. Paramedics who have been recertified by other employers in Oregon, except perhaps the City of Salem, would not be employable by AMR. The recertification requirements imposed by Drs. Jui and Schmidt are sufficient, but not necessary, for a Paramedic to gain or continue employment with employers outside Multnomah and Clackamas Counties.

Moreover, the change in the statutory licensing requirements supports plaintiffs. Before 1995, the recertification requirements for Oregon Paramedics consisted of a bi-annual accumulation of 75 hours of continuing education, and a variety of prescribed topics, as well as bi-annual certification in CPR and ACLS. Howard Kirkwood was the chief of Emergency Medical Systems for the Oregon Health Division when the Health Division changed the administrative regulations governing paramedic training requirements for licensure. According to Kirkwood:

The 75–hour requirement was believed to be excessive by many paramedics, particularly when compared to the requirements for physicians, nurse, attorneys, etc. Moreover, the model of the National Standard Curriculum generally provided for repetition of the same subject matter in each biennium, which was both boring and not particularly beneficial to experienced practitioners . . . .

After a consensus process involving a Task Force on Paramedic Recertification Requirements (a sub-committee of the State's EMS Committee per ORS Chapter 682), the State EMS Committee advised the Health Division to adopt new requirements. A formal report was issued. The rationale for the various components were as follows:

a. Replace the basic knowledge covered by the 48 hour course with a written examination that would allow paramedics already possessed of the core knowledge of their profession to demonstrate their expertise in a 3–hour examination, or require self-study of those who were deficient. This would also reduce the recertification burden on the licensee.

b. Require verification of critical skills. This new component, also adopted at that time by the National Registry, is designed to fulfill one of the fundamental precepts of licensure—assurance of the public that the licensee possesses the minimum level of skill so as to not constitute a threat to the health and safety of the public.

c. Encourage more diverse continuing education, through removal of the "topical" breakdown of previously required subject matter, and to recognize professional development continuing education in addition to purely clinical topics.

d. Replace the mandatory certifications (CPR, ACLS, and PHTLS) with content or objective-based analogues.

Plaintiffs' Exhibit 54, pp. 2–3.

In summary, Oregon changed its licensing requirements to reduce redundancy, reduce the burden on the licensee, and rely more on testing of practical skills required of Paramedics in the field. One of the purposes was to reduce the largely repetitious certification training which was not considered essential.

The training requirements imposed by Drs. Jui and Schmidt thwart those purposes by retaining the mandatory certifications and increasing the number of training hours. Such requirements can hardly be said to correspond with Oregon's current minimum skill requirements. According to Kirkwood, "all Oregon paramedic

recertification requirements, including the verifications of critical skills, can now be satisfied within the 24 hours of state-mandated CMEs." *Id* at 3. As previously noted, all of the verifications of competencies would take only a few hours with skills testing. Even adding the minimum requirement of two hours of direct training by the Physician Supervisor, it seems apparent that Oregon Paramedics can satisfy all their recertification requirements within the minimum 24 hour CME requirement.

The fact that Drs. Jui and Schmidt have chosen a particular method to verify a particular skill does not convert all of the training hours to satisfy their preferred method into a state requirement. Although Oregon law requires both 24 hours of CME every two years and verification of competencies, it does not expressly require verification of competencies on top of the 24 hours of CME. Not only can verification of competencies be accomplished within the 24 CME hours, but most other agencies in Oregon employing Paramedics do so.

The "special situations" exception should not be interpreted to swallow the general rule of 29 CFR § 785.27(c) that training time is compensable if it is "not directly related to the employee's job." This requirement is meant to encompass all forms of training that do not qualify the employee for advancement or promotion. 29 CFR § 785.29. The unique exception of college-type courses should be restricted to those situations in which the course is clearly offered on a voluntary basis for the benefit of the employee. Here, AMR seeks to stretch this exception to cover largely redundant instruction, which is not necessary to work as a Paramedic for most other Oregon employers.

With respect to prospective employers, the subjective intentions of the Physician Supervisors are irrelevant. One Physician Supervisor may be motivated only by concerns for the best possible medical care, while another may be motivated by self-interest, by laziness, or by a concern over renewal of his or her contract. Other employers either require or do not require similar certifications. The employee benefit is commensurate with the extent to which these extra training hours are needed for employment as a Paramedic other than at AMR. If the effect on the employee is the same, then the compensability of training time should be the same.

Any training time in excess of 24 hours exceeds the minimum state requirements, does not enable plaintiffs to gain or continue employment with other Oregon employers of Paramedics, and thus is not primarily for the benefit of the employee. Accordingly, AMR has not sustained its burden of proof that this training falls within the "special situation" exemption. Because this training is "directly related" to plaintiffs' jobs, it is compensable "working time" pursuant to 29 CFR § 785.27.

## IV. *Conclusion*

For the above reasons, AMR is entitled to summary judgment against the remaining (post-May 6, 2000) claims by the Washington paramedics and plaintiffs are entitled to summary judgment as to claims by Oregon Paramedics in Multnomah and Clackamas Counties for training that exceeds 24 hours every two years.